**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| PAMELA MOORE, | ) | CASE NO.  1:10-cv-2913 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Pamela Moore ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying

Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is REVERSED and REMANDED for further proceedings

consistent with this memorandum opinion and order.

## I.    PROCEDURAL HISTORY

On May 8, 2006, Plaintiff filed applications for DIB and SSI and alleged a disability onset date of November 27, 2004.  (Tr. 9.)  The applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 9.)  On April 28, 2009, an ALJ held Plaintiff's hearing and continued the hearing so that Plaintiff could further develop her record.  (Tr. 19, 45.)  On July 14, 2009, the ALJ resumed Plaintiff's hearing.  (Tr. 9, 19.)  Plaintiff appeared, was represented by counsel, and testified.  (Tr. 9.)  A vocational expert ("VE") also appeared and testified.  (Tr. 9.)  On September 23, 2009, the ALJ found Plaintiff not disabled.  (Tr. 16.)  On October 26, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On December 23, 2010, Plaintiff timely filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  On June 10, 2011, Plaintiff filed her Brief on the Merits.  (Doc. No. 15.)  On July 25, 2011, the Commissioner filed his Brief on the Merits.  (Doc. No. 16.)  Plaintiff did not file a Reply Brief.

Plaintiff asserts two assignments of error:  (1) the ALJ failed to find that some of Plaintiff's impairments were severe; and (2) the ALJ failed to assess Plaintiff's credibility properly pursuant to Social Security Ruling 96-7p.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 44 years old on the alleged disability onset date, 47 years old on the

date she was last insured, and 48 years old on the date of her hearing.  (Tr. 59.)  She has a high school education.  (Tr. 23.)  She attended business school for one year and obtained a certificate as an office specialist.  (Tr. 23, 60.)  She has past relevant work as a housekeeper, waitress, fast food worker, retail stocker, janitor, home health aide, security guard, and institutional cook.  (Tr. 15.)

### B.    Medical Evidence

Plaintiff has a history of asthma, sinusitis, and eczema.  (Tr. 233, 235, 246.)  On July 15, 2004, Plaintiff presented to Huron Hospital with a complaint of chest pain.  (Tr. 238, 246.)  Attending physician Sayed S. Khatami, M.D., indicated that Plaintiff reported developing a sudden, sharp pain in her chest that radiated to her left arm, with complete numbness in the left arm, as she was walking to work.  (Tr. 246.)  Dr. Khatami indicated that Plaintiff smoked "two packs per day" for the past ten years and did not follow up with a primary care physician.  (Tr. 238, 246.)  Dr. Khatami reported that a CT scan of Plaintiff's lungs revealed mediastinal cavitary lesions with irregular nodules in her right upper lung.  (Tr. 238.)  Dr. Khatami attributed Plaintiff's chest pain to an exacerbation of Plaintiff's asthma.  (Tr. 238.)  Plaintiff underwent a lung biopsy without complications.  (Tr. 238.)  By July 20, 2004, Plaintiff's chest pain had resolved and Plaintiff was discharged in stable condition with instructions to follow up with the hospital's outpatient department.  (Tr. 238.)

On November 14, 2004, Plaintiff presented to Huron Hospital with complaints of nausea and vomiting.  (Tr. 277.)  Dr. Khatami attended to Plaintiff and opined that Plaintiff likely suffered gastritis.  (Tr. 277-78.)  Dr. Khatami noted that Plaintiff complained of left hand numbness that was consistent with carpal tunnel syndrome and

3

planned to obtain an neurological consultation to evaluate Plaintiff's symptoms further.

(Tr. 278.)  Dr. Khatami further indicated that Plaintiff reported smoking cigars for the

past twenty years, and Dr. Khatami recommended that Plaintiff quit smoking.  (Tr. 277-

78.)

On January 4, 2005, Plaintiff presented to Dr. Samir Abraksia, M.D., upon

referral and for a follow-up on her chest pain.  (Tr. 233.)  Dr. Abraksia reported the

following.  A biopsy of Plaintiff's lungs in November 2004 did not reveal evidence of

malignancy in Plaintiff's lymph nodes.  (Tr. 233.)  Plaintiff smoked two or three cigars a

day and continued to complain of shortness of breath upon exertion, fatigue,

generalized body aches, and chronic dry cough.  (Tr. 233.)  Although Plaintiff

complained of "some left finger numbness for more than two or three months," Plaintiff

did not suffer "objective weakness over that time."  (Tr. 233.)

On January 11, 2005, Plaintiff presented to Huron Hospital's outpatient

department with a complaint of difficulty breathing.  (Tr. 294-95.)  The resident

physician[1] who attended to Plaintiff diagnosed Plaintiff with asthma, sinusitis, eczema,

and sarcoidosis.[2]  On February 15, 2005, Plaintiff returned to the outpatient department

---

[1]  The record does not clearly indicate the resident physician's name and
credentials.

[2]  Sarcoidosis is "a chronic, progressive, systematic granulomatous reticulosis of
unknown etiology, characterized by hard tubercles . . . in almost any organ or
tissue, including the skin, lungs, lymph nodes, liver, spleen, eyes, and small
bones of the hands and feet."  Dorland's Illustrated Medical Dictionary 1656
(30th ed. 2003).

4

with a complaint of moderate, sharp pain and palsy[3] on the right side of her face that had begun two weeks prior.  (Tr. 293.)

On October 30, 2005, Plaintiff presented to the Cleveland Clinic Foundation with a complaint of shortness of breath that had begun one week prior.  (Tr. 322.)  Attending physician David V. Gagliotti, M.D., reported the following.  (Tr. 322.)  Plaintiff had been diagnosed with sarcoidosis in March and had been taking Prednisone, but Plaintiff had not been taking her Prednisone for a week because she ran out of the medication.  (Tr. 322.)  Plaintiff had been diagnosed with Bell's palsy[4] two weeks prior when she presented to the hospital with left facial droop and pain.  (Tr. 322.)  On examination, Plaintiff had a slight facial droop on the left side and a lesion on her seventh cranial nerve.  (Tr. 322.)  Dr. Gagliotti discharged Plaintiff with medication (Prednisone, a Combivent inhaler, an Albuterol inhaler, and Lisinopril), and instructed Plaintiff to attend follow-up appointments in November and December.   (Tr. 323.)

On November 16, 2005, Plaintiff presented to Dr. Daniel A. Culver, D.O., at the Sarcoidosis Center for evaluation of her sarcoidosis.  (Tr. 324.)  Dr. Culver indicated that Plaintiff reported the following.  Plaintiff was diagnosed with sarcoidosis in November 2004 and was given Prednisone in March 2004.  (Tr. 324.)  Her breathing had improved and her right facial palsy had resolved after two or three months when she was given Prednisone, but when she stopped taking Prednisone her shortness of

---

[3] Palsy means "paralysis."  Dorland's Illustrated Medical Dictionary, *supra* note 2, at 1353.

[4] Bell's Palsy is "unilateral facial paralysis of sudden onset, due to lesion of the facial nerve and resulting in characteristic distortion of the face."  Dorland's Illustrated Medical Dictionary, *supra* note 2, at 1353.

breath, chest pain, and Bell's palsy symptoms would return.  (Tr. 324.)  She stopped

taking Prednisone on occasion because she ran out of it.  (Tr. 324.)  Dr. Culver

reported that Plaintiff's symptoms were "consistent with treatment-requiring active

sarcoidosis," reduced Plaintiff's Prednisone dosage to 10 mg, and advised Plaintiff to

quit smoking.  (Tr. 326.)

On December 15, 2005, Plaintiff presented to the Sarcoidosis Center for a

follow-up.  (Tr. 328.)  Physician assistant Karla Pearson, PA-C, attended to Plaintiff

under the supervision of Dr. Culver and reported that Plaintiff's Bell's palsy was still

present but slightly improved.  (Tr. 328.)  Ms. Pearson indicated that Plaintiff reported

she was attempting to quit smoking, and that her breathing was "ok."  (Tr. 328.)  Ms.

Pearson's impression of a CT scan was that Plaintiff's sarcoidosis appeared slightly

improved.  (Tr. 328.)  Ms. Pearson recommended that Plaintiff decrease her

Prednisone dosage to 7.5 mg, start taking Azmacort, use over-the-counter Sudafed for

her nasal congestion, and follow up in three months.  (Tr. 329.)

On April 2, 2006, Plaintiff presented to the hospital emergency room with a

complaint of shortness of breath that had begun the night before and had become

worse.  (Tr. 331.)  Attending physician Laura Holmes, M.D., reported that, other than

Plaintiff's shortness of breath, a review of Plaintiff's systems was negative.  (Tr. 331.)

Dr. Holmes assessed Plaintiff with asthma exacerbation and sarcoidosis, admitted

Plaintiff into the "CDU for observation," and noted that Plaintiff would need a steroid

treatment.  (Tr. 331.)  Dr. Nolan D. McMullin, M.D., attended to Plaintiff in the CDU and

reported that Plaintiff had no complaints other than her shortness of breath.  (Tr. 333.)

Dr. McMullin gave Plaintiff an oral steroid treatment that improved Plaintiff's condition.

6

(Tr. 333.)  Dr. McMullin recommended that Plaintiff use beta agonist inhalers and oral steroids to control her symptoms, and that Plaintiff follow up as scheduled.  (Tr. 333.)

On April 3, 2006, Plaintiff presented to the Sarcoidosis Center for a follow-up. (Tr. 427.)  Ms. Pearson attended to Plaintiff under the supervision of Dr. Culver.  (Tr. 427.)  Ms. Pearson indicated that Plaintiff reported the following.  Plaintiff's shortness of breath had become worse since her Prednisone dosage had been reduced to 7.5 mg. (Tr. 427.)  She quit smoking in January and did not drink alcohol.  (Tr. 427.)  She was not able to fill her Azmacort prescription "due to insurance purposes," but was "attempting to get assistance through [the] drug company."  (Tr. 427.)  Ms. Pearson recommended that Plaintiff start a "prednisone taper as directed in ED," obtain Pulmicort through the drug company if she was able, and follow up in one to two months.  (Tr. 427-28.)

On May 8, 2006, "J. Malone," the state agency employee who interviewed Plaintiff in-person upon Plaintiff's protective application for disability benefits, reported that it did not appear Plaintiff had any problems with hearing, reading, breathing, understanding, presenting herself coherently, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing.  (Tr. 144-46.)

On July 12, 2006, Plaintiff underwent a consultative examination by Dr. Adi Gerblich, M.D., upon referral from the Bureau of Disability Determination.  (Tr. 407-22.)  Dr. Gerblich reported that Plaintiff's chief complaints were asthma and sarcoidosis.  (Tr. 409.)  Upon review of Plaintiff's systems, Dr. Gerblich indicated that Plaintiff reported the following.  Plaintiff's Bell's palsy was "getting better" but still caused her discomfort in her right eye; she had a numb sensation in her hands; she suffered stiffness in her

7

joints in the morning that dissipated throughout the day; and she had eczema.  (Tr. 409-

10.)  Upon physical examination, Dr. Gerblich reported that Plaintiff's back, ability to feel

sensations, upper and lower body muscle power, hand grasp and manipulation, and

range of motion were normal.  (Tr. 410.)  Dr. Gerblich assured that the examination was

reliable, and assessed Plaintiff with sarcoidosis and Bell's palsy with only mild

respiratory limitations as evidenced by pulmonary functioning testing.  (Tr. 410.)

On October 6, 2006, Plaintiff presented to the Sarcoidosis Center for a follow-up.

(Tr. 424.)  Ms. Pearson indicated that Plaintiff reported the following.  Plaintiff ran out of

Prednisone the week before and since then had increased shortness of breath and

coughing.  (Tr. 424.)  Plaintiff did not follow up with the assistance program for

obtaining Pulmicort and did not begin taking Pulmicort.  (Tr. 424.)  She was taking

Albuterol, and the Albuterol was helpful.  (Tr. 424.)  She was not taking "ICS" or "PPI"

because she could not afford it, as she did not have prescription insurance.  (Tr. 424.)

Ms. Pearson restarted Plaintiff on Prednisone at 7.5 mg per day; gave Plaintiff a dose

of Pulmicort and an application to obtain Pulmicort through the drug company;

encouraged Plaintiff to obtain Pulmicort through the drug company if she was able;

recommended that Plaintiff take over-the-counter medications for rhinitis and GERD[5]-

related symptoms; and advised Plaintiff follow up in three months.  (Tr. 425.)

On June 4, 2009, Plaintiff underwent a consultative examination by Dr. Franklin

Krause, M.D., upon referral from the Bureau of Disability Determination.  (Tr. 498-99.)

Dr. Krause indicated that Plaintiff reported the following.  Plaintiff smoked 7 to 8 small

---

[5]  GERD stands for "gastroesophageal reflux disease."  Dorland's Illustrated
Medical Dictionary, *supra* note 2, at 765.

8

cigars a day.  She voluntarily stopped using Prednisone the prior year and then re-started taking it; however, at the time of her examination she had not taken Prednisone for a month.  (Tr. 498.)  She currently was taking Pulmicort and Albuterol, but she ran out of Prednisone.  (Tr. 498.)  She wheezed from time to time and suffered dyspnea,[6] which caused her chest to feel tight.  (Tr. 498.)  She suffered low back pain since she received epidural blocks with her childbirths, as well as pain in her knees and ankles.  (Tr. 498.)  She lived with her daughter, was able to care for herself, and could do minimal cooking, cleaning, and shopping.  (Tr. 498.)  She could sit for 40 minutes, stand for 30 minutes, and walk for 10 minutes.  (Tr. 498.)

Dr. Krause reported the following upon physical examination.  Plaintiff had a full range of motion in her ankles and knees.  (Tr. 499.)  Her gait was tentative, and she had a limp that tended to favor the left ankle.  (Tr. 499.)  Although Plaintiff reported some pain upon compression of either ankle, there was no redness, warmth, swelling, or synovial thickening.  (Tr. 499.)  She displayed some facial asymmetry, but she could wrinkle her forehead and close her eyes.  (Tr. 499.)  Dr. Krause diagnosed Plaintiff with "a history of pulmonary Sarcoid with unremarkable chest x-ray"; history of asthma, with normal O2 saturation and ventilatory studies"; "history of low back pain without radiculopathy"; and "history of ankle pain, with absence of clinical findings."  (Tr. 499.)  Dr. Krause summarized his findings as follows:

> This patient has pulmonary Sarcoid and asthma.  At this point, her oxygen saturation, chest x-ray, ventilatory studies are within normal limits.  She has some issues with low back pain without radiculopathy and there is evidence

---

[6]  Dyspnea is "breathlessness or shortness of breath."  Dorland's Illustrated Medical Dictionary, *supra* note 2, at 578.

of degenerative disc disease.  By history, she can sit, stand and walk for a limited period of time but there are no specific findings on physical exam to support this other than complaints of pain.

(Tr. 499.)

Dr. Krause assessed Plaintiff's physical residual functional capacity ("RFC") as follows.  Plaintiff could lift up to 20 pounds frequently and up to 50 pounds occasionally; carry up to 20 pounds occasionally; sit for 8 hours, stand for 2 hours, and walk for 1 hour at a time without interruption; and sit for 8 hours, stand for 4 hours, and walk for 4 hours total in an 8 hour workday.  (Tr. 506-07.)  She could continuously reach, handle, finger, feel, push, and pull with either hand; and she could frequently operate foot controls with either foot.  (Tr. 508)  She could occasionally climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, and crawl.  (Tr. 509.)  She could frequently work in unprotected heights and around moving machinery, operate a motor vehicle, and tolerate vibrations and loud noise such as heavy traffic.  (Tr. 510.)  She could occasionally tolerate humidity and wetness.  (Tr. 510.)  She could never tolerate dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat.  (Tr. 510.)  Finally, she was able to perform activities such a shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, two canes, or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle, and use papers and files.  (Tr. 511.)

10

C.    **Hearing Testimony**

1.    **Plaintiff's Testimony**

Plaintiff testified at her April 28, 2009, hearing as follows.  Plaintiff had poor circulation and her joints ache—particularly in her legs.  (Tr. 58.)  She also suffered numbness in her left hand.  (Tr. 58-59.)  She took Prednisone once a day and used inhalers.  (Tr. 64.)  She did not have a nebulizer.  (Tr. 64.)  She used to smoke cigars, but she quit smoking approximately two years prior.  (Tr. 64.)

Plaintiff testified at her July 14, 2009, hearing as follows.  Because of her breathing difficulties, it took Plaintiff approximately one hour after waking in the morning to become fully active.  (Tr. 34.)  She was able to shower, but not for as long as she could before because she had trouble standing for long periods of time.  (Tr. 35.)  She could walk one block before she had to stop because of shortness of breath and pain in the left side of her chest.  (Tr. 35.)  She could walk up only three flights of steps.  (Tr. 36.)  Her breathing difficulty interfered with her ability to sleep.  (Tr. 35.)  She kept her windows open and used two humidifiers and a fan to help her breathing.  (Tr. 36.)  She could not go grocery shopping alone because she could not walk for long periods of time; and she could not go shopping with her daughter because she would have to sit in her car and wait for her daughter to do the shopping, and she could not sit for long periods of time.  (Tr. 36-37.)  Plaintiff could not even help put groceries away at home. (Tr. 37.)  Plaintiff's numbness in her left hand, arm pain, and breathing problems prevented Plaintiff from being able to vacuum or push a broom.  (Tr. 35.)  Her breathing problems interfered with her ability to walk, climb stairs, and sleep.  (Tr. 35-36.)  She

11

could not lift more than 10 pounds or sit for more than 45 minutes at a time.  (Tr. 37.)

Plaintiff did not have medical insurance.  (Tr. 33.)  She could not obtain subsidized care because being "rated" for subsidized care required proof that she had no income and she had a problem with her income tax return that needed to be resolved.  (Tr. 33; *see* Tr. 52-53.)  Accordingly, although Plaintiff's doctors recommended that Plaintiff take various medications, Plaintiff was not able to obtain those medications because she could not afford them.  (Tr. 33.)  Plaintiff was able to obtain certain medications when she presented to the emergency room, however, and those medications tended to make Plaintiff feel better; but the supply of medication from the emergency room was limited.  (Tr. 33.)  She presented to the emergency room no more than necessary because the hospital billed her for services rendered.  (Tr. 34.)

The only medications Plaintiff took within 24 hours were her Albuterol inhaler and Pulmicort.  (Tr. 25.)  She had not taken her steroid medication because she ran out of it several months prior.  (Tr. 25.)  She ran out of her steroid medication because she was not given a long-lasting supply.  (Tr. 25.)  She did not have a primary care physician because she could not afford one.  (Tr. 26.)  She still smoked cigars from time to time when she became stressed.  (Tr. 26.)

### 2.    The VE's Testimony

Plaintiff's attorney waived challenging the VE's qualifications, and the VE testified that his testimony would be consistent with the Dictionary of Occupational Titles and its companion publication, the Selected Characteristics of Occupation.  (Tr. 27.)  The ALJ posed the following hypothetical person to the VE:

12

> Assume an individual with the same vocational profile as the claimant.  We have a younger individual with a high school and above education.  Assume I find that this individual could lift or carry 20 pounds occasionally, 10 pounds frequently. She can sit at least six hours in an eight-hour day with normal breaks, meaning about every two hours.  She can stand and walk at least six hours in a normal day, again, with normal breaks, meaning about every two hours.  This individual cannot climb any ladders, ropes, or scaffolds, but she can perform all other postural maneuvers on a frequent basis. This individual should avoid concentrated exposure to hot and cold temperature extremes; concentrated exposure to fumes, odors, dusts, or gases . . . [and] concentrated exposure to high humidity. This individual should avoid work at unprotected heights or around hazards.

(Tr. 38.)  The VE testified that such a person could perform Plaintiff's past relevant work as a waitress and as a fast food worker.  (Tr. 38.)

The ALJ then posed a second hypothetical to the VE:  "Same as hypothetical number one, except that, instead of concentrated exposure to fumes, odors, dusts, or gasses, I've got even moderate exposure to fumes, odors, dusts, and gases, but that will be the only change that I have."  (Tr. 39.)  The VE testified that such a person could still perform Plaintiff's past relevant work as a waitress and as a fast food worker.  (Tr. 39.)

Plaintiff's attorney asked the VE whether a person such as that described in the ALJ's first hypothetical could perform any of Plaintiff's past relevant work if the person were off task 15 to 20 percent of the time with complaints of shortness of breath.  (Tr. 41.)  The VE testified that such a person would not be able to perform any of Plaintiff's past relevant work or any other work.  (Tr. 42.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y*

*of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

14

prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2008.

2.   The claimant has not engaged in substantial gainful activity since November 27, 2004, the alleged onset date.

3.   The claimant has the following severe impairments: sarcoidosis, asthma, and eczema.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work . . . except claimant can lift and carry 10 pounds frequently and up to 20 pounds maximum occasionally.  She can sit for at least 6 hours in an 8 hour day with normal breaks every 2 hours and can stand or walk at least 6 hours in an 8 hour day with normal breaks every 2 hours. She cannot climb ladders, ropes or scaffolds. She can perform all other postural maneuvers on a frequent basis. She should avoid even moderate exposure to cold and hot temperature extremes and high humidity. She should avoid dust, fumes, gases or odors.  She should not work at unprotected heights or around hazards.

6.   The claimant is capable of performing past relevant work as a fast food worker and waitress. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

9.   The claimant has not been under a disability, as defined by the Social Security Act, from November 27, 2004 through the date of this decision.

(Tr. 11-15.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ.  *Id.*  However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

16

### B.    The ALJ's Determination of Severe Impairments

Plaintiff argues that  the ALJ erroneously failed to find that Plaintiff's Bell's palsy, left wrist neuropathy, and back pain were severe impairments.  The Court finds that this assignment of error lacks merit because it is, at most, harmless error and is not a basis for remand.

Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments, or combinations of impairments, as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  However, all of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process.  *See* 20 C.F.R. § 404.1545(e).

Here, the ALJ found at step two that Plaintiff suffered the following severe impairments:  sarcoidosis, asthma, and eczema.  (Tr. 11.)  The ALJ explained that

17

Plaintiff's Bell's palsy was not a severe impairment because it resolved with treatment. (Tr. 11.)  The ALJ noted that an x-ray of Plaintiff's back showed degenerative disc disease with anterior spurring, but the ALJ did not explain the significance of the x-ray. (Tr. 11.)  The ALJ did not mention Plaintiff's left wrist neuropathy.  Upon these findings, however, Plaintiff cleared step two of the disability analysis.  *See Anthony*, 266 F. App'x at 457.

The ALJ discussed Plaintiff's Bell's palsy, left wrist neuropathy, and back pain in her RFC assessment (Tr. 13-15), and Plaintiff has not explained how the ALJ's analysis of these impairments in her RFC assessment was deficient.  Accordingly, any defect in the ALJ's assessment of Plaintiff's Bell's Palsy, left wrist neuropathy, or back pain at step two of her analysis would be, at most, harmless error and is not a basis for remand.  *See Anthony*, 266 F. App'x at 457 (citing *Maziars*, 837 F.2d at 244); *Pompa*, 73 F. App'x at 803.

**C.    The ALJ's Assessment of Plaintiff's Credibility**

Plaintiff contends that the ALJ failed to assess Plaintiff's credibility properly pursuant to Social Security Ruling 96-7p.  For the following reasons, the Court agrees.

An ALJ must be clear why she finds that a claimant's subjective statements are not credible:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's

18

statements and the reasons for that weight.

S.S.R. 96-7p, 1996 WL 374186, at *2 (1996).  The ALJ began her assessment of

Plaintiff's credibility as follows:

> After careful consideration of the evidence, I find that the claimant's
> medically determinable impairments could reasonably be expected to cause
> the alleged symptoms; however, the claimant's statements concerning the
> intensity, persistence and limiting effects of these symptoms are not credible
> to the extent they are inconsistent with the above residual functional capacity
> assessment.

(Tr. 13.)  The ALJ then discussed the record evidence, some of which appears to

support the conclusion that Plaintiff was not as limited as she claimed.  That evidence is

as follows.  Plaintiff's "asthma exacerbations [were] usually after upper respiratory

infections or lack of medication (either due to a lack of funds, insurance or non-

compliance)," and Plaintiff's "sarcoidosis ha[d] not affected pulmonary functioning to

[an] extreme extent since she started on Prednisone treatment."  (Tr. 13.)  When

Plaintiff presented to Dr. Gerblich on July 12, 2006, her "Bell's palsy  . . . was

improving," although "she still had discomfort in the right eye."  (Tr. 13.)  Dr. Gerblich's

examination of Plaintiff revealed that Plaintiff's chest was clear to auscultation and

percussion; Plaintiff's upper and lower body muscle power, hand grasp and

manipulation, and range of motion were normal; and pulmonary function testing showed

only a mild obstructive ventilatory defect.  (Tr. 14.)  On October 6, 2006, Plaintiff proved

non-compliant with a recommendation to obtain Pulmicort through an assistance

program.  (Tr. 14.)  Plaintiff had been taking Albuterol, however, and it helped Plaintiff.

(Tr. 14.)  On June 4, 2009, Plaintiff admitted to Dr. Krause that she continued to smoke

7 to 8 small cigars a day.  (Tr. 14.)  Dr. Krause noted that Plaintiff was capable of self

19

care and minimal cooking, cleaning, and shopping; and that Plaintiff had full range of motion in her ankles and knees.  (Tr. 14.)  Moreover, Dr. Krause noted that Plaintiff's pulmonary functioning studies were normal.  (Tr. 14.)

But the ALJ also discussed evidence which appears to support Plaintiff's subjective statements, as follows.  One of the reasons Plaintiff lacked medication that adequately controlled her asthma was that Plaintiff could not afford the medication.  (Tr. 13.)  Although Plaintiff's sarcoidosis did not limit Plaintiff's pulmonary functioning to an extreme extent since Plaintiff began taking Prednisone, Plaintiff often ran out of Prednisone.  (Tr. 13-14.)  Although Plaintiff was not hospitalized for her sarcoidosis, she presented to the emergency room with breathing difficulties, whereupon she was given only limited supplies of Prednisone.  (Tr. 14.)  Plaintiff reported to Dr. Krause that she suffered pain in her ankles, knees, and back; and that she could sit for only 40 minutes, stand for only 30 minutes, and walk for only 10 minutes.  (Tr. 14.)  And Dr. Krause's examination of Plaintiff revealed that Plaintiff's "[a]ir entry was markedly diminished."  (Tr. 14.)

The ALJ did not explain the logical nexus between her finding that Plaintiff's statements were incredible and the evidence that followed her finding.  Moreover, the ALJ did not reconcile the contradictions in the evidence that she cited in her apparent assessment of Plaintiff's credibility.  The ALJ's finding that Plaintiff's sarcoidosis was adequately controlled with Prednisone is particularly disconcerting.  If a claimant suffers an impairment that is disabling absent treatment, and the claimant cannot afford the treatment and cannot otherwise obtain it, then the impairment would be deemed disabling.  *See McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990).  The ALJ found

that Plaintiff's sarcoidosis was severe, but she did not reconcile her finding that Plaintiff's sarcoidosis was controlled with Prednisone with Plaintiff's testimony that she could not afford Prednisone and could only obtain it in small quantities when she presented to the emergency room with breathing problems.  In short, the ALJ failed to provide sufficiently specific and clear reasons for the weight she gave to Plaintiff's statements.  Remand is necessary for the ALJ to provide such specific and clear reasons for her assessment of Plaintiff's credibility that are supported by the record evidence.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for further proceedings consistent with this memorandum opinion and order.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  November 30, 2011

21